## [No. 1920.]

## Z. A. STEPHENS *v*. THE STATE.

| | |
|---|---|
| 20 | 255 |
| 28 | 128 |
| 28 | 147 |
| 20 | 255 |
| 30 | 316 |
| 20 | 255 |
| 35 | 128 |

1. MURDER.— INDICTMENT for murder, alleging that the homicide was committed with malice aforethought, is sufficient without alleging that the killing was unlawful.

2. PRACTICE — EVIDENCE.— See the statement of the case for the testimony of Mrs. Davis and Frank Sanders, witnesses for the State, *held* to have been improperly admitted because the evidence of the first of these witnesses was irrelevant, and tended in no degree to establish the guilt of the accused, and because the evidence of the second witness was not responsive to the question propounded by the counsel for the accused, was not elicited by the defense, and was hearsay.

3. SAME.— DECLARATIONS of defendant concerning the crime charged against him, made ten or fifteen minutes after the commission of the same, and after he had gone a distance of four or five hundred yards from the place of the homicide, cannot be treated as *res gestæ*, and, therefore, are not admissible in his behalf.

4. SAME — PRIVILEGE OF COUNSEL — CHARGE OF THE COURT.— In view of the facts that the character of the defendant was not put in issue by the evidence, and that the trial court rejected evidence to the effect that the defendant was once arrested for robbery, it was a palpable abuse of the privilege of argument on the part of the counsel for the State to discuss the one and advert to the other in argument. See the statement of the case for a special charge as to the presumption of law concerning character, which, in view of the improprieties noted, should have been given in this case.

APPEAL from the District Court of Milam. Tried below before the Hon. W. E. Collard.

The indictment in this case charged the appellant with the murder of Buck Scales, in Milam county, Texas, on the 27th day of February, 1885. His trial resulted in his conviction for manslaughter, and his punishment was assessed at a term of two years in the penitentiary.

Mrs. Miranda Scales was the first witness for the State. She testified that Buck Scales, the deceased, died on the 1st day of March, 1885, from the effects of pistol-shot wounds inflicted on the night of February 28, 1885, at the house of W. S. Davis, in Milam county, Texas. A child's party, at which only children under the age of twelve years were permitted to dance, was given at Davis's house on that night. The deceased, his brother A. M. or "Bud" Scales, and the defendant attended the party. Sometime prior to this party, the deceased told the witness that he wanted to whip Stephens, the defendant, but did not know him even by sight, and charged the witness to point the defendant out to him at the first

opportunity which might arise. When the deceased walked from the front gallery into the room where the children were dancing, the defendant was standing near John Bingham, leaning against a bureau which stood in the room near the door. Witness told the deceased that the defendant was present. Deceased asked: "Where is he?" Witness replied: "There he is, right there by you," pointing to the defendant. Deceased walked up to the defendant and said to him: "Come out here, I want to see you." Defendant replied: "Very well, sir," and followed the deceased out of the house. Witness heard a pistol shot just after the two parties passed beyond the door.

About two years prior to the shooting, and while the defendant and A. M. (Bud) Scales, the witness's husband, were living together, the defendant told the witness that he wrote a letter to the daughter of Buck Scales (deceased), and that the same was returned to him without answer and unopened, and that he intended to have revenge upon the Scaleses for that treatment. Witness's husband and defendant did not fall out about that remark, which witness reported to her husband. Witness attached no importance to the letter episode, and paid no attention to the threat to which it gave rise. Old man and old lady Scales knew all about the letter matter, which, though it was not regarded as a serious matter, was discussed in the family. At the time of the letter incident the deceased lived in Williamson county. He moved to Milam county during the fall of 1884, and it was after his removal that he requested witness to point the defendant out to him. The night of the shooting was the first opportunity witness had of doing so. If defendant had ever been in deceased's house, or knew or had seen deceased's daughter, witness did not know it, and she knew nothing more about the letter than defendant told her. If the defendant ever arrested the witness's husband, Bud Scales, witness did not know it. Bud Scales was arrested in Johnson county and brought back to Milam county at the time that the defendant was a deputy sheriff, and witness learned that he, defendant, was a witness against the said husband, and was "working up" the case against him. Witness had never heard the deceased say that defendant should never appear to testify in that case. Witness reported the defendant's remark about the letter prior to the arrest of her husband. Deceased did not visit the witness's house while defendant lived there. Witness did not notice the hands of the deceased as he and defendant passed out of the door at Davis's house, just before the shooting, and could not say that he did or did not have them in his pockets. Defendant, when

he was accosted by the deceased, was standing against the bureau, his hand in his bosom, looking at the dancing.

Frank Sanders was the next witness for the State. He testified, in substance, that he took his children to Davis's house to the party on the night of the shooting. Leaving his children in the dancing room, he retired to the gallery, where he spent some time in conversation with the deceased. After a time the deceased left the gallery and went into the dancing room. Witness followed as far as the door, where he stopped and watched the dancing for a few minutes, and then returned to the gallery, and took up his position against a post. Presently two persons passed from the house to the center of the gallery, but witness, apprehending no trouble of any kind, paid no attention to them, and did not observe who they were. His attention was presently attracted by words which he did not understand, and he turned just in time to see the pistol discharged, and deceased's coat fly back at the left side. Deceased and defendant were standing on the gallery facing each other. Deceased's left hand was hanging down by his left side, which was towards witness, and his right hand was not visible to the witness. Deceased caught defendant by the shoulder and pressed him backwards, the defendant retiring backwards into the dancing room. A second shot was fired about the time the parties entered the door, and the two fell about the middle of the floor. Witness ran in to get his children out of the way of danger, and saw no more. Deceased's left hand was crippled during the war. Witness saw no weapon in the deceased's hand, nor did he see deceased strike the defendant. Gus Cox was on the gallery when the shooting occurred.

The cross-examination of this witness elicited the evidence which is referred to in the second head-note of this report. The transcript recites it as follows: "Defendant asked the witness if he did, not have a conversation with the deceased, Buck Scales, just before the difficulty began. He said that he did. The defendant's counsel then asked him if the deceased, Buck Scales, did not try to borrow a pistol from him. Witness answered: 'He inquired of me if I carried my pistol with me on every trip I went out peddling. I told him that I did.' He, deceased, said: 'Well, then, that settles it: I understand they are putting up a job on me, and I have nothing to defend myself with but an old shot-gun as heavy as a fence-rail.'"

Gus Cox testified, for the State, that he went to the party at Davis's to play the fiddle for the children to dance to. Witness's arm becoming tired during one of the dances, he was relieved by another fiddler and retired to the gallery, leaving the dance in prog-

ress.  He passed and shook hands with the defendant at the bureau, met and shook hands with the deceased at the door, the deceased going into the room, and witness passed out to the gallery, where he met and shook hands with Frank Sanders.  Within a few minutes witness turned and looked into the room and saw deceased take his hand from the defendant's shoulder, and heard him say to the defendant: "Come out here; I want to talk to you."  The two walked out of the room, the deceased in advance.  As the defendant passed out of the door to the gallery witness saw him thrust his hand into his bosom, and as he was withdrawing it, the witness saw what he took to be a white-handled pistol.  Defendant was withdrawing his hand from his bosom about the time he reached the middle of the gallery, at which point the deceased turned and asked defendant: "What do you mean by that?"  Defendant replied: "I will show you what I mean," fired, and shot the deceased.  Witness knew positively that the deceased did not have his hand in his pocket, and that he had nothing in his hand when shot.  Witness looked particularly at deceased as soon as he saw defendant's hand in his bosom, being impressed with the conviction that, if deceased was armed, shooting would ensue, in which case he wanted to get away from the vicinity.  Witness left as soon as the firing commenced, and saw no more of the difficulty between deceased and defendant.  Witness was summoned by, and assisted Deputy Sheriff Chapman to arrest the defendant.

Cross-examined, the witness stated that he passed one night at the house of Jim Avery about a week after the shooting, and, in the course of a conversation with said Avery, about the shooting, said that, if defendant or any other man was to shoot in his house among his women and children, he, witness, would shoot him like a dog or wolf.  He denied that in that conversation he said to Avery: "I would shoot Stephens (defendant) as soon as I would a wolf if I could see him."  After the difficulty in which deceased was shot, witness saw a part but not the beginning of a difficulty between the defendant and Bud Scales.  When witness first saw defendant and Bud Scales, they faced each other from opposite sides of a wagon, Bud Scales endeavoring to shoot defendant and defendant endeavoring to escape Bud by dodging.  When Scales would try to shoot over the wagon, defendant would dodge down, and when Scales, would stoop to shoot under the wagon, defendant would rise up.  Finally by a rapid movement Bud Scales succeeded in firing under the wagon, his shot taking effect in defendant's thigh.  Witness then caught Scales to prevent him from shooting again, and defendant

fled around the house, and witness saw no more of him for the time. Scales released himself from witness by threatening to shoot witness, and started in pursuit of defendant, but was stopped at the chimney at the corner of the house. It is not true that the witness caught and held Bud Scales until defendant passed beyond the shelter of the wagon, and then released him with the cry: "Now, Bud! Now is your time!" On the contrary he held Scales as long as he could after defendant left the cover of the wagon.

Witness, Bud Scales and Mark Baxley put the deceased, then wounded, into the wagon and took him home, witness driving the wagon. Witness could not remember that any other person assisted either in putting deceased in the wagon at Davis's or taking him out at his home. Mose Waddell was at deceased's house when the wagon arrived, but if he aided in taking deceased out of the wagon, the witness could not recall that fact. Witness did not hear deceased say, when he was being taken out of the wagon: "I could have killed the scoundrel, but he was too quick for me." It was possible that he may have made such remark, but, if he did, witness did not hear it. Mose Waddell, John Poe, old man Sam Scales, deceased's two daughters, and perhaps others were at deceased's house when the wagon with the deceased reached home. After he was safely placed in the house, deceased remarked: "I could have killed him in the house, but I did not want to shoot among the women and children."

Mrs. W. S. Davis testified, for the State, that she was the wife of the W. S. Davis at whose house the shooting occurred. The defendant, among quite a number of adults, was present at a child's party given at W. S. Davis's house, on the night of the shooting, but he was not invited to attend. Deceased brought his children, who were invited guests, early in the evening. Defendant appeared about 9 o'clock, and, so far as the witness knew, came alone. If he came with the witness's husband, who was the head of the household, the witness did not know it. The witness and the defendant were on bad terms at the time, and had not spoken to each other for eighteen months. Witness first saw the defendant on that night when he took his position in the house between the door of the dancing room and a bureau. A few minutes after the defendant got into the house, witness saw the deceased approach the bureau. He then walked from the room to the gallery, the defendant following behind. Defendant halted near the door, and presently witness heard the discharge of a pistol. Witness then saw defendant backing into the room through the door, the deceased following with his

hands on him.  About this time another shot was fired.  Deceased made no motion or demonstration towards the defendant when he approached him near the bureau, but merely invited him to a talk outside.  He had nothing in his hand that the witness saw.  The casualties resulting from the difficulty were the death of Mr. Hodges, the wounding and subsequent death of the deceased and the wounding of Frank Sibley.  The wife of A. M. (Bud) Scales was the witness's daughter.

The cross-examination of this witness elicited the testimony first alluded to in the second head-note of this report.  She stated that her son-in-law, Bud Scales, was once arrested by the defendant, and that her unfriendly feelings toward the defendant dated from the time of that arrest.  At this point the State requested the witness to state the reason of her unfriendly feeling for the defendant, and she was permitted to state, over the objections of the defendant, that, after Bud Scales was indicted, papers for his arrest were placed in the hands of the defendant, who was then a deputy sheriff, for execution.  Bud Scales had then gone off, and defendant told his, Bud's, wife (witness's daughter) that if she would go off, join Bud and stay with him, he would not bother about him, but that if she remained in the county, he would be compelled to arrest Bud if he could.  Accordingly, Bud's wife disposed of her property at a sacrifice and went to her husband in Johnson county, whither the defendant followed and arrested Bud Scales and brought him back. That treatment of her daughter inspired the witness's ill will to the defendant.  Buck and Bud Scales, the former's two daughters aged respectively fourteen and sixteen years, John and Sarah Bingham, Gus Cox, John Poe and other grown people were at the party, but no one was an invited guest except the children under the age of twelve years.

John W. Poe testified, for the State, that he was in attendance upon the juvenile party at Davis's house on the night of the shooting, but saw nothing of the difficulty between the defendant and the deceased.  He saw the defendant as he ran around the house with Bud Scales after him.  Believing that the defendant had gone, the witness continued his way to the house, and as he stepped in at the front door he saw the defendant run in at the back door of the kitchen, and through into the front room, with Hodges in pursuit. Reaching the front room, defendant rushed to the corner, caught up Davis's gun, which was standing there, turned with it and fired upon Hodges, and then fled with the gun over his shoulder through the front door, and witness saw no more of him.  Witness did not

help put the deceased in the wagon, did not go with the party who took deceased home, and was not at the deceased's house when the party arrived with him, and, of course, did not help take deceased out of the wagon. The wagon in which deceased was taken home belonged to witness, and witness did not know that it was used by Gus Cox and others to take deceased home, until it was brought back.

Berry Bounds testified, for the State, that the ball which produced the death of the deceased entered his breast under the left nipple. Witness saw the deceased a very short time before his death. Internal hemorrhage was then in progress, and death was inevitable. Deceased, while yet rational, made a voluntary statement to the witness respecting the fatal rencontre. Witness asked no questions, but as he entered the room was called by deceased to his bedside. Deceased then said: "Uncle Berry, I want to tell you how it happened. I was at the party at Davis's, and saw Zed Stephens there. I asked him to come out on the gallery, as I wanted to see him. When we got out on the gallery I turned around and saw him pulling his pistol out of his bosom, and I asked him what he meant. He replied: 'D—n you, I'll show you what I mean,' and shot me in the groin. I grabbed him to take the pistol away from him. He backed into the house, and as we were going in he shot me in the breast," putting his hand on his left breast. "I had been told that they had put up a job on me, but I did not believe that my neighbors would do such a thing, and I went right into it." A. K. Smith was present when the deceased made the statement repeated by the witness.

Cross-examined, the witness said that he could not admit that he was on friendly terms with the defendant. He felt towards the defendant as he would feel towards any man who had committed a like crime. A prosecution for horse theft was pending against Bud Scales at the time of the difficulty. Defendant was a State's witness in that case, and the witness was under process to appear as a witness for the defense. Witness had never heard deceased utter a threat against defendant.

A. K. Smith testified, for the State, that he was at the house of the deceased just before his death, and heard a conversation between deceased and Berry Bounds. Deceased started to tell the witness about the manner of his injury, but stopped and asked if any improper person was present. Being informed that there was not, he proceeded to make the statement to Bounds, substantially as it was recited by Bounds. During the time of this interview, the

deceased requested the witness to cut off the right hand pocket of his pants, as the contents hurt him in the manner he was lying. Witness replied that he could remove them without cutting the pocket. Deceased replied that he would have no more use for the pocket, and to cut it out as the easier way to remove its contents. Witness then cut out the pocket, which he found to contain $1.50 and a pair of brass knucks.

Cross-examined, the witness repeated his statement that when he emptied the pocket he cut from the pants of the deceased he found it to contain a pair of brass knucks. In January, 1885, while the deceased was at the witness's mill, Henry Quinn came there, and in the course of a conversation asked witness what kind of a man Stephens, the defendant, was. Deceased asked witness, after Quinn left, what he, Quinn, wanted. Witness replied to him and he, deceased, said: "I can tell him if he wants to know. Stephens and all of his friends are thieves and rascals, and I want to tell Quinn so to see if he will take it up, and if he does I want to whip him." Witness told deceased that he wanted no rows about his mill. The witness never reported deceased's remark to either Quinn or the defendant. Deceased was a very large, muscular man, about six feet and four inches tall, and near about twice the size and strength of the defendant, who would weigh perhaps one hundred and thirty pounds.

A. M. (Bud) Scales testified, for the State, that he was in attendance upon the party at Davis's, but saw nothing of the difficulty until after the pistol shots were fired. When the witness first saw the defendant the latter was on the floor struggling with the deceased for the possession of the pistol. Deceased, who was on top of defendant, had hold of the pistol with one hand, and the defendant held it with both hands. Deceased exclaimed: "Oh Bud, help me! He has killed me. Try to get this pistol from him." Witness caught the pistol with both hands, when the deceased turned it loose, and defendant turned the muzzle towards witness in an effort to shoot the witness, but the witness thrust his thumb between the hammer and the cartridge, and so prevented the discharge of the pistol, and finally wrenched the weapon from the defendant. Defendant crawled from under deceased and ran out of the house. Deceased said: "He has killed me; give me the pistol." Witness handed the pistol to the deceased, and he started in pursuit of the defendant. He got as far as the edge of the gallery, when he fell and dropped the pistol. Witness caught up the pistol and pursued the defendant, who took refuge behind a wagon. Witness followed

to the opposite side of the wagon, and after a little maneuvering managed to get a shot at the defendant, firing under the wagon. Gus Cox then caught witness and defendant fled around the house. Witness made Cox release him, and followed the defendant with the pistol as far as the chimney at the end of the house, where he met W. S. Davis and others, who stopped him and proposed to take the pistol from him, which the witness told them they could not do. Davis then told witness that defendant was gone, and the witness thereupon surrendered the pistol to Davis.

Cross-examined, the witness stated that his wife was W. S. Davis's daughter. Witness, his wife and their children were at Davis's house in attendance upon the party. A few minutes before the shooting witness proposed to his wife to go home. She replied that it was not yet 9 o'clock by ten minutes, a fact which witness verified by consulting the clock. The witness was prosecuted for horse theft. The defendant, who was a deputy sheriff, was a witness for the State, was serving papers in the case, and was engaged in working up the case against the witness. Witness left Milam county and went to Johnson county, where he was arrested and brought back. This arrest in Johnson county, the witness had been informed, was brought about by the instrumentality of the defendant. Witness helped to place the deceased in Gus Cox's wagon that night, and, with Mark Baxley, Gus Cox, John Poe and deceased's two daughters, went to deceased's home with the wagon. As the party with the wagon passed out of the gate at Davis's, they met Sam Scales, a brother of the witness and the deceased, and Mose Waddell, who accompanied the party and the wagon to the deceased's house. Witness, Gus Cox, Mark Baxley and John Poe took the deceased from the wagon into the house. Mose Waddell was then standing at the gate, but did not help remove deceased, nor did he touch him. Deceased did not say that he would have "killed the scoundrel but he was too quick" for him. He did say: "I could have killed him in the house, but I did not want to shoot among the women and children."

R. R. Shelton testified, for the State, that he knew the defendant, Bill Smith, Alvin Hart, Gus Cox and one Harris. Witness did not tell Alvin Hart and Harris that the defendant told him that he, defendant, and Bill Smith had "put up a job" on the deceased, and had agreed to kill him,— the defendant to do the killing. The first intimation that witness ever had that such a statement was to be imputed to him was when A. Hart and Harris accosted him in the presence of the three Thomas boys, who were now in attendance

upon court and sequestered under the rule, and disclosed their purpose to extort such testimony from him. Hart on that occasion covered witness with his gun, and the two told him that they were going to report that witness had told them that defendant had told him, witness, that he, defendant, and Bill Smith had put up a job on deceased, and would kill him. They further told witness that, if he denied that statement after they made it, they would kill him. The witness did not tell Hart and Harris that the killing happened just as he, witness, had told them it would happen. Witness could not and did not know that the killing was going to take place. Witness did not go to Hart's house on the morning after the difficulty and ask Hart to go with him to the home of deceased, but he did ask Hart to go with him to Davis's to get the true particulars of the shooting. Witness and Hart, however, did go to deceased's house on that morning. Witness did not feed, harbor or in any way aid the defendant after the shooting. Witness did not tell the searching party in pursuit of defendant that he had not seen the defendant, but did tell them, and truthfully, that he did not then know the whereabouts of the defendant. Witness had a party at his house on the night of the shooting. Defendant came by witness's place after the shooting, and stopped there a few minutes in conversation with witness. He, defendant, was then working on the place of the widow Thomas, about a mile from the witness's place.

Wyatt Lipscomb testified that he was sheriff of Milam county when Bud Scales was indicted for horse theft. Defendant was then a deputy under the witness, was a witness for the State against Bud Scales, and worked up the case against him. He found out and reported to witness that the said Scales was in Johnson county, to which county the witness went and arrested the said Scales. Defendant was not a deputy under the witness at the time the deceased was shot. The State closed.

John Bingham was the first witness for the defense. He testified that he attended the juvenile party at Davis's house, and, just before the difficulty, stood between the bureau and the door in the dancing-room, one arm resting on the bureau. Defendant stood next, resting one arm on the witness's shoulder. The two were merely looking on at the dancing. Presently the deceased came into the dancing-room and told his daughters to go home, who objected that it was then but 9 o'clock. Deceased then passed to a point near the bureau, when Bud Scales's wife said to him: "There is Stephens." Deceased asked: "Where?" Mrs. Scales replied: "There; right

there at you." Deceased then approached the bureau, thrust his right hand in his pocket, touched the defendant with his left hand, and said: "Come out here, young man, I want to see you." Apparently he was angry. Defendant followed the deceased out of the room to the gallery, remarking only: "All right." Witness followed as far as the door, where he stopped. Just as the witness reached the door, he saw the deceased turn and confront the defendant, and say something which he did not understand. Defendant in reply to what was said by the deceased asked: "What do you mean?" Deceased replied: "D—n you, I will show you what I mean." Witness observed that the deceased's right arm was in motion as if in an effort to draw something from his pocket. At about that time defendant drew his pistol and fired. Deceased then caught defendant and pushed him backwards into the room, where in the scuffle that ensued they fell to the floor, deceased on top. Bud Scales then joined in the struggle. Defendant managed to escape from his antagonist and fled through the front door.

W. S. Davis was the next witness for the defense. He testified that he left his house, at which the children's dance was going on, a little before 9 o'clock, and went to George McCown's to get a drink, at which place defendant was then living. The defendant returned with the witness to the dance. He was neither invited nor forbidden to go by the witness. He had, however, lived with the witness at one time, and knew that he was perfectly welcome to his house. Defendant and witness's wife were not then on good terms. Mrs. Davis's enmity grew out of the indictment of Bud Scales for horse theft. The witness had previously learned that an ill feeling existed between the defendant and the deceased, and, as he and the former passed through the gate, going to the house, witness cautioned defendant that the deceased was in the house, and told defendant that he wanted no disturbance in his house. Defendant replied that he wanted merely to see the children dance, and did not want a difficulty. Witness saw the deceased when he stepped up to the bureau at which the defendant was standing, but did not observe his manner, nor how he carried his hands. Defendant was quietly looking on at the dance when he was called out by the deceased. Witness saw nothing that occurred on the gallery, but heard the report of a pistol which was there discharged. He saw the parties when they got back into the house, and heard the second shot that was fired just as they returned through the door. Both belligerents fell to the floor. Deceased and his brother Bud took the pistol from the defendant, and the defendant fled through the front door, pursued

by deceased with the pistol. Deceased fell at the edge of the gallery and dropped the pistol, which was then secured by Bud Scales, who then pursued defendant to the wagon behind which he had taken refuge, and fired at him. Defendant then fled from the wagon around the house. Bud Scales, with the pistol, pursued him as far as the chimney at the end of the house, where the witness met and disarmed him. Just at that moment a shot was fired in the house. Witness's gun was then standing at its accustomed place, in the front room between the desk and the clock. Defendant knew that the witness usually kept his gun in that place.

Nathan Ward testified for the defense that, when the difficulty began, he was standing in the door between the two rooms. He ran out through the back door and around the house, and as he started into the front of the house he met the defendant in flight, with the deceased, armed with a pistol, in pursuit. Deceased fell at the edge of the gallery, and dropped the pistol. Bud Scales secured the pistol and pursued the defendant to the wagon behind which he had sought refuge. Witness at this time observed Gus Cox standing near the gallery with an open knife in his hand. After several attempts Bud Scales managed to fire a shot at the defendant from the opposite side of the wagon. Defendant flinched as though struck. Cox then caught deceased, when defendant left the cover of the wagon in flight towards the house. When he got clear of the wagon, Cox released Scales and exclaimed: "Now, Bud! Now is your time." Bud Scales then ran after the defendant, and was in pursuit when witness started to the house. About the time witness reached the gallery, a shot was fired inside of the house, and defendant ran out at the front door with a shot-gun on his shoulder. Witness then went into the house and found Hodges lying on the ground just outside of the back door. Witness asked Hodges what the matter was with him. He replied: "Nath., Zed has killed me, but it was through mistake." On the night after the shooting, the witness and his wife visited their brother-in-law, Frank Sanders, and his family, at their house. The said Sanders, on that night, in the presence of witness's wife and the members of his own family, told witness that, at Davis's house, and just before the difficulty, deceased requested the loan of his pistol, and that, in all probability, he, Sanders, would have loaned it to him if he had had it with him.

James Avery testified for the defense that, about a week after the shooting at Davis's, Gus Cox, *en route* home from Rockdale, stopped over night at the witness's house. In a conversation about the diffi-

culty, Cox said to witness: "If I could see Zed Stephens, I would shoot him down like a wolf." He used no qualifying words whatever. Cox's remark was as stated by witness, and not that if "Stephens had shot in his house among his women and children, as he had done at Davis's, he would shoot him down like a wolf or dog." Witness was then a deputy sheriff of Milam county. Some time afterwards, Cole Jones brought witness a message from the defendant. Witness went to a place designated, where the defendant surrendered, saying that he was afraid of a numerous party then in search of him. Defendant was then taken to Cameron in a wagon, and at night, to avoid a party of men then hunting for him. Witness was well acquainted with both the defendant and Hodges, and knew them to be warm personal friends.

Mose Waddell testified, for the defense, that he had almost reached Davis's house, *en route* to the party, when the shooting began. Mack Bingham was with him, and both were horseback. They met Bud Scales and Ira Bounds at Davis's gate, taking the deceased home in a wagon. Witness and Bingham returned, riding in advance of the wagon, and were at deceased's gate when the wagon arrived. Witness and Bingham were requested to, and did assist in removing deceased from the wagon into the house. When he was being taken out of the wagon deceased remarked, "I would have killed the scoundrel, but he was too quick for me." Bud Scales was then present, standing at the fence, eight or ten feet off. Old man Scales, deceased's father, was present, and stood near enough to hear the remark.

Oscar Jackson testified, for the defense, that about an hour after the shooting was alleged to have occurred, the defendant stopped at the house of the witness's father and, for a few minutes, conversed with the witness. (This conversation was excluded by the court.) On the following night a large crowd of men in pursuit of defendant came to the house and asked if Stephens, defendant, had been there. That crowd was composed of Bose Scales, Joe Curtis, Ham Poe, Gus Cox, Dave Monteman, Sam Radford, and others not now remembered by witness. At another time the same crowd, with the possible exception of Cox and Scales, came to the house and asked the same question. Witness's father asked if they wanted to take defendant to court. The parties replied: "No; we want to catch and hang him. We are court enough for him."

Cole Jones testified, for the defense, that a few days after the shooting defendant came to his house and told him that he was afraid of the pursuing party, and wanted to surrender to an officer

who would protect him.  Witness summoned Avery, to whom defendant surrendered. · Avery and witness took defendant to Cameron at night, in a wagon.  Defendant was then suffering from a wound in his thigh.

R. E. Jennings testified, for the defense, that he knew the deceased in his life-time, but had never known or seen the defendant prior to this trial.  In December, 1883, deceased came to the witness in the town of McDade, and asked him if he knew a fellow named Zed Stephens, who was a deputy sheriff of Milam county.  Witness replied that he did not.  The deceased then said to witness:  "I want you to write a letter to him that the horse he lost is down here, and for him to come and get him.  When he comes I want to know it.  He is a witness against my brother, Bud Scales, up there, charged with stealing a horse, and I want to kill the d—d half-nigger son-of-a-b—h."

Cross-examined, witness stated that at the time of the interview referred to he, witness, was constable of the town of McDade.  Witness and deceased were friends.  Witness was then a friend to deceased because he had to be.  Witness said nothing to defendant about the threats.  He told other parties about them, and they advised witness not to repeat them; that, if he did, and deceased heard of it, he would kill witness.  Deceased had lived at McDade, and everybody there knew him and his general character well.

The transcript contains the following: "The following facts were sufficiently proved on the trial of this case, viz: Venue, time, and the fact that the deceased died from the effects of the pistol-shot wound inflicted by the defendant.  Twelve witnesses (naming them) proved threats by the deceased prior to the difficulty, covering the period between the difficulty and the preceding fall term of the district court.  The various threats were that he, deceased, would whip Stephens; stamp him into the earth until he was too small to grow out again; that he, deceased, 'only wanted to see Stephens one time;' that Stephens would never appear to testify against Bud — many of which threats were communicated to the defendant.  One witness, Tuck Gardner, testified that on one occasion, on the Rockdale road, the deceased, then armed with a shot-gun, said: 'I will kill him.' By eighteen witnesses (naming them) it was proved that the general reputation of the deceased in the community in which he lived was that of a violent, dangerous man, and one likely to execute any threat.  By three witnesses it was proved that when he lived at McDade, four or five years ago, the deceased habitually bore arms."

The defense concluded the testimony by putting in evidence the

indictment against A. M. (Bud) Scales, charging him with the theft of John Armstrong's horse, upon which indictment the defendant's name was indorsed as a prosecuting witness. The motion for new trial raised the questions discussed in the opinion.

The special charge refused by the court, and which is referred to in the last head-note of this report, reads as follows:

"The defendant asks the court to instruct the jury as follows: You are charged that the law presumes that the defendant has a good character, and you cannot presume against it because defendant failed to introduce evidence of a good character, and every pre-sumption in favor of his innocence is indulged by the law."

*E. L. Antony* filed an able brief and argument for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WILLSON, JUDGE. I. Under repeated decisions of this court, the indictment is a good one. It is in the form which has been approved in numerous cases. (Willson's Cr. Forms, 388, p. 173.) Alleging, as it does, that the homicide was committed with malice aforethought, it was unnecessary to also allege that it was "unlawful." If committed with malice aforethought, it was necessarily unlawful.

II. Several objections are urged to the charge of the court, which we shall not take time to discuss. Some of these objections are not supported by the record, and none of them are in our opinion well founded. We have carefully scrutinized the charge in the light of the objections made to it, and our conclusion is that it is a full and correct statement of the law applicable to the evidence, and is in no respect materially erroneous. It presents clearly the law upon every issue, and upon every phase of the defense raised by the evidence, and in as favorable a light for the defendant as the facts would justify. We think the defendant has no good ground of complaint against the charge.

III. The testimony of Mrs. Davis, that she had not invited defendant to her house; that there was bad feeling on her part toward defendant, and stating the cause of such bad feeling, should not have been admitted. It was irrelevant, and did not legitimately tend, in even a remote degree, to establish defendant's guilt. We cannot say, however, that it was not calculated to prejudice the defendant in the minds of the jury. The jury may have concluded from this evidence that the defendant was at Davis's house when the kill-

ing occurred, wrongfully, or at least under circumstances which rendered it improper that he should be there. They may have concluded that the defendant had, by his conduct towards Mrs. Davis's daughter and son-in-law, Buck Scales, given Mrs. Davis good cause to be at enmity with him, and that his presence at her house on the occasion of the homicide was, under these circumstances, an insult to her and the Scaleses. His presence there, as shown by the evidence, was merely accidental,— not preconceived, and for no unlawful purpose. He went there with Mr. Davis, the head of the family, to look on at a children's dance, and was quietly enjoying the scene when the difficulty between him and the deceased began. His presence at the house being thus explained, the testimony of Mrs. Davis, while it did not tend to prove malice or unlawful intent on the part of the defendant in going there, placed him in the attitude of an intruder upon the premises so far as she was concerned, and if her testimony was considered at all by the jury, it could have produced no other than an unfavorable impression upon their minds against the defendant.

IV. We are of the opinion that the testimony of the witness Frank Sanders, as to the conversation between him and deceased, should have been excluded. His answer was not responsive to the question propounded to him by defendant's counsel, and cannot be regarded as having been elicited by the defendant. It was hearsay, and only admissible when offered or called for by the defendant, and it was not called for by the question propounded. It was testimony calculated to prejudice the defendant, as it tended to show a conspiracy on the part of defendant and others to kill the deceased, and was also in corroboration of the dying declaration of the deceased.

V. We are not prepared to say that the court erred in rejecting evidence offered by defendant to prove statements made by him concerning the homicide, and the reasons which actuated him in committing it. These statements were made some ten or fifteen minutes after the killing, and after the defendant had gone a distance of four or five hundred yards. We do not think, under the circumstances of this case, that it should be held that such statements were admissible as *res gestæ*. To so hold would be opening the door for such testimony wider than it has ever yet been opened in this State. (Clark's Cr. Law, 540, note; *Pharr* v. *The State*, 10 Texas Ct. App., 485; *Brunet* v. *The State*, 12 Texas Ct. App., 521; *Walker* v. *The State*, 13 Texas Ct. App., 618; *Neyland* v. *The State*, id., 536.)

VI. It was improper in counsel for the State to discuss the character of the defendant, as his character was not put in issue by the evidence, and it was likewise improper to inject into the case the fact that defendant had at one time been arrested for robbery, and still more improper for State's counsel to refer to this fact in his argument, when the court had excluded the evidence in relation to it. In view of these improprieties in the trial, we think the court, in order to prevent, as far as possible, any prejudice to the defendant by reason thereof, should have given the jury the special charge requested by defendant's counsel, as to the presumption of the law concerning character.

Other questions than those we have discussed are presented in the record, and in the brief and argument of counsel for defendant, but they are questions of minor importance, and may not arise on another trial, and we therefore do not discuss or decide them.

In view of the errors which we have discussed, we do not think that the defendant has had a perfectly fair trial. We think it probable that the minds of the jury may have been influenced to his prejudice by the incompetent testimony admitted, and also by the improper remarks of counsel for the State in their addresses to the jury. The accused is entitled to a perfectly fair and impartial trial, in accordance with the rules of the law, and as we do not think, judging from the record, that this right has been fully accorded him, the judgment is reversed and the cause is remanded for another trial.

*Reversed and remanded.*

[Opinion delivered February 3, 1886.]